The **CITY OF BRADY, Texas,**
**Appellant,**

v.

**Terry BENNIE, Julie Bennie, Dr. J.L.**
**Morris, and Diamond Mineral**
**Investments, Inc., Appellees.**

**No. 11–86–087–CV.**

Court of Appeals of Texas,
Eastland.

July 9, 1987.

Rehearing Denied Sept. 17, 1987.

Samuel D. McDaniel, Bankston, Wright & Greenhill, Austin, for appellant.

Charles Scarborough—Scarborough, Black, Tarpley & Scarborough, Abilene, G. Lee Haney, Brownwood, for appellees.

**OPINION**

McCLOUD, Chief Justice.

Terry and Julie Bennie, Dr. J.L. Morris, and Diamond Mineral Investments, Inc. sued the City of Brady for tortious interference with a gas purchase contract and for slander of title. Based upon the jury's answers to special issues, judgment was entered for the plaintiffs. We affirm.

Dr. J.L. Morris owned three tracts of land in Brown County which covered a part of a gas storage reservoir located in the Caddo Formation in the Janellen Field. In 1962, Morris entered into a 10–year gas storage lease covering these three tracts. The gas storage lease contained two 10–year renewal options; however, the storage lease expired in 1972 when Brady Municipal Gas Corporation, the holder of the lease, failed to properly exercise the first 10–year option.

In 1976, Morris leased by separate leases the three tracts to George O'Brien, who subsequently assigned the leases to Brady Gas. Brady Gas then entered into a farmout agreement with O'Brien which allowed O'Brien to produce minerals above and below a defined area of the Caddo Formation. Under the terms of the agreement, Brady Gas was to assign to O'Brien or his assignees acreage within the leases upon the drilling and completion of wells to a depth either above or below the designated area. Through subsequent, partial assignments, George O. Sanders and Tanbark Oil Company acquired interests in the farmout agreement; and Tanbark drilled wells under the terms of the farmout agreement. Brady Gas refused to deliver assignments of the acreage allegedly earned by the Tanbark wells contending that Tanbark had improperly drilled into the storage reservoir. This refusal to assign resulted in Tanbark suing Brady Gas.[1] Eventually Brady Gas' as-

---

1. Prior to trial in the state court, Brady Gas filed a petition in bankruptcy; and the state court action was stayed. The Bankruptcy Court approved a reorganization plan which provided in part that all of Brady Gas' assets would be transferred to the City of Brady and that the City would assume all contracts and obligations.

Summary judgment was then granted in the state court action in favor of the City on the grounds that Tanbark's damage claim was barred by res judicata because it could have been pursued in the bankruptcy court but was not. The summary judgment was affirmed on appeal. Tanbark Oil Company 1978-1, Ltd.,

sets, as well as its contracts and liabilities, were transferred to the City of Brady.

On July 31, 1981, Terry and Julie Bennie purchased the three tracts of land from Morris. Morris retained a mineral interest in the tracts. These tracts are known as Bennie Tracts Nos. 1, 2, and 3. In September of 1982, Diamond Mineral Investments, Inc., a closely held family corporation formed by the Bennies, acquired a lease from the Bennies and Morris on Tract No. 3. Diamond purchased the well known as the Bennie No. 1 on Tract No. 3 from Tanbark in May 1983 and subsequently entered into a gas purchase agreement with Lone Star Gas Company to sell gas from the Bennie No. 1.

The present suit arose out of a letter concerning the purchase of gas from the Bennie No. 1. The letter, written by an attorney employed by the City and addressed to Lone Star, stated in part:

> Our client [City of Brady] has previously injected natural gas into the Janellen (Caddo) Field and believes that the Subject Well [Bennie Well No. 1] is producing such injected gas. As you know (*see Lone Star Gas Co. v. Murchison,* 353 S.W.2d 870 (Tex.Civ.App.—Dallas, 1963 [1962] writ ref'd n.r.e.) it is the rule in Texas that the owner of natural gas does not lose title thereto when that gas is stored in an underground reservoir. By draining our client's stored natural gas, Diamond is guilty of converting that gas and has no authority to sell such gas to Lone Star.
>
> The City of Brady has instructed us to pursue all available legal remedies to protect its stored gas. We hereby request that payments be suspended until title to the gas in question can be determined.

The letter was dated February 7, 1984; Lone Star shut in the Bennie No. 1 on March 5, 1984.

The Bennies and Diamond sued the City alleging tortious interference with the Lone Star gas purchase contract and slander of title and sued the attorney for libel. Summary judgment was granted in favor of the attorney, and the libel suit was severed from the present case.[2] Morris was then added as a plaintiff to the tortious interference with a contract and slander of title actions.

The City contends that: (1) there is no evidence, and alternatively insufficient evidence, to support the jury's finding on the slander of title theory; (2) recovery for damages is precluded because of this Court's opinion in the libel suit;[3] (3) there is no evidence, and alternatively insufficient evidence, to support the jury's findings on the tortious interference with a contract theory; (4) exemplary damages cannot be awarded against a municipality; (5) no breach of the Lone Star gas purchase contract occurred; (6) the City had valid mineral leases on the Bennie property; (7) testimony was improperly admitted; and (8) the judgment was based upon findings not submitted to the jury and did not dispose of all the parties. In view of our affirmance on the tortious interference theory, the points challenging the findings on the slander of title theory will not be discussed.

The City argues that the trial court erred in refusing to grant the City's motion for judgment notwithstanding the verdict because the letter sent to Lone Star was absolutely privileged as determined in the libel suit. We disagree.

■ Communications made in the course of a judicial proceeding are absolutely privi-

---

George H. O'Brien and *George O. Sanders v. City of Brady, Texas,* No. 11–85–080–CV, (Tex.App.—Eastland, August 22, 1985, writ ref'd n.r.e.) (unpublished opinion).

2. The summary judgment in the libel suit was affirmed by this Court on appeal. *Terry Bennie et ux et al v. Brown, Maroney, Rose, Barber, and Dye and John E. Gangstad,* No. 11–85–069–CV (Tex.App.—Eastland, August 1, 1985, no writ) (unpublished opinion). This Court held that the

attorney's letter was written preliminary to a proposed judicial proceeding and was, therefore, absolutely privileged. *Russell v. Clark,* 620 S.W.2d 865 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.).

3. *Terry Bennie et ux et al v. Brown, Maroney, Rose, Barber, and Dye and John E. Gangstad,* supra.

leged and cannot constitute the basis of an action for libel or slander. *Reagan v. Guardian Life Ins. Co.*, 140 Tex. 105, 166 S.W.2d 909 (1942). This privilege extends to communications made in contemplation of a judicial proceeding. *James v. Brown*, 637 S.W.2d 914 (Tex.1982). However, as stated by the majority and dissenting opinions in *Sakowitz, Inc. v. Steck*, 669 S.W.2d 105 (Tex.1984), a "qualified," but not an "absolute," privilege may be urged in a suit for tortious interference. The majority opinion in *Sakowitz, Inc. v. Steck*, supra at 107, stated:

> To establish the necessary elements for her claim of tortious interference, Steck [plaintiff] had to show (1) that the defendant maliciously interfered with the contractual relationship, (2) without legal justification or excuse.

Justice Wallace in his dissenting opinion, supra at 109, also stated:

> It must be noted that the claimed privilege is not absolute, *but qualified*, and can only be sustained if the interferor can show either: (1) that he has an equal or superior right to that of the plaintiff or, (2) he has a good faith belief that such a superior right exists. C.f., *Black Lake Pipe Line Co. v. Union Construction Co.*, 538 S.W.2d 80, 91 (Tex.1976). (Emphasis in original)

Citing *Griffin v. Rowden*, 702 S.W.2d 692 (Tex.App.—Dallas 1985, writ ref'd n.r. e.), the City argues that lis pendens is absolutely privileged in an action for tortious interference with a contract. The letter was not the filing of a lis pendens, and this case does not involve lis pendens.

■ The City also claims that the libel suit is conclusive of this case, is res judicata, is the law of the case, and is stare decisis. We disagree.

Res Judicata is defined as:

> [T]he doctrine that a question of law or fact, distinctly put in issue and directly determined by a court of competent jurisdiction as a ground for recovery or defense in a suit or action between parties sui generis, is conclusively settled by the final judgment or decree therein, so that it cannot be further litigated in a subse-

quent suit between the same parties or their privies.

48 TEX.JUR.3d *Judgments* sec. 351 (1986). This appeal involves different causes of actions, issues, and parties than the libel suit. Therefore, the doctrine of res judicata does not apply; and the libel suit is not conclusive of this case.

The City also argues that the doctrines of the law of the case and of stare decisis apply. The doctrine of the law of the case "applies only to decisions of questions of law and is confined in its operation to subsequent proceedings in the same case." 48 TEX.JUR.3d *Judgments* sec. 353 (1986). 48 TEX.JUR.3d *Judgments* sec. 353 (1986) also states:

> The doctrine of stare decisis is a rule under which the determination of a question of law by a court of ultimate resort becomes a part of the law of the state and a precedent governing the decision of subsequent matters involving the same point.

■ The question of law decided in the appeal of the libel suit, that an absolute privilege should be granted to the attorney's letter relating to pending or proposed litigation, differs from the qualified privilege question in this case. Here, the City is not entitled to an "absolute" privilege defense in a suit for tortious interference. See *Sakowitz, Inc. v. Steck*, supra. Even though the letter was a privileged communication by the City's attorney in an action in damages for libel, the cause of action for tortious interference against the City is not barred. See *James v. Brown*, supra; *Steck v. Sakowitz, Inc.*, 659 S.W.2d 91 (Tex.App. —Houston [14th Dist.] 1983), *rev'd on other grounds*, 669 S.W.2d 105 (Tex.1984).

The trial court submitted the following special issues involving the tortious interference theory:

## SPECIAL ISSUE NO. 1

From a preponderance of the evidence, what do you find to have been the volume of economically recoverable native gas, if any, which the Bennies would

have had under their land on July 31, 1981 absent injection of extraneous gas?

Answer in mcf:

ANSWER: 200,000 MCF

\* \* \* \* \* \*

### SPECIAL ISSUE NO. 3

Do you find from a preponderance of the evidence that the writing of the letter of February 7, 1984 was an act of unjustified interference by the City of Brady between the Plaintiffs and Lone Star Gas Company?

Answer "We do" or "We do not."

ANSWER: We do

You are further instructed that a party is justified in interfering with contractual relationships of others where such interference is in exercise of the party's own rights or where the party possesses an equal or superior interest in the subject matter.

If you have answered Special Issue No. 3 "We do," and only in that event, answer Special Issue No. 4.

### SPECIAL ISSUE NO. 4

Do you find from a preponderance of the evidence that such act was a proximate cause of the damages to the Plaintiffs, if any?

Answer "We do" or "We do not."

ANSWER: We do

The term "PROXIMATE CAUSE" means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred; and in order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom.

### SPECIAL ISSUE NO. 5

Do you find from a preponderance of the evidence that the City of Brady acted with actual malice in sending the letter to Lone Star Gas Company on February 7, 1984?

Answer "We do" or "We do not."

ANSWER: We do

You are instructed that "ACTUAL MALICE" means that something is communicated with knowledge that it was false or with reckless disregard of whether it was false or not.

If you have answered Special Issue No. 5 "We do," and only in that event, answer Special Issue No. 7.

### SPECIAL ISSUE NO. 6

What sum of money, if paid now in cash, do you find from a preponderance of the evidence would compensate the Plaintiffs for their damages, if any, from the loss of their gas from the Bennie property from March 5, 1984 until the present time?

Answer in dollars and cents, if any.

ANSWER: $275,000.00

### SPECIAL ISSUE NO. 7

What sum of money, if paid now in cash, do you find from a preponderance of the evidence, should be assessed against the City of Brady as exemplary damages?

Answer in dollars and cents, if any.

ANSWER: $25,000.00

"EXEMPLARY DAMAGES" means an amount that you may in your discretion award as an example to others and as a penalty or by way of punishment, in addition to any amount you may have found as actual damages. You may consider compensation for inconvenience, attorney's fees, expense of litigation, and other expenses not recoverable as actual damages.

The City argues that there is no evidence to support the jury's answers to all of these special issues and that, alternatively, there is insufficient evidence to support the jury's answers to Special Issues Nos. 1, 3, 4, 5, and 6. We disagree.

In reviewing a no evidence point, only the evidence and the inferences therefrom which tend to support the jury verdict shall be considered, with all evidence to the contrary being disregarded; and if there is any evidence of probative value to support

the jury verdict, the verdict must be affirmed. *International Armament Corporation v. King,* 686 S.W.2d 595 (Tex.1985); *Martinez v. Delta Brands, Inc.,* 515 S.W.2d 263 (Tex.1974); *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965). In reviewing the City's factually insufficient evidence points of error, this Court must consider and weigh all the evidence and reverse the trial court only if the jury's findings are so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Pool v. Ford Motor Company,* 715 S.W.2d 629 (Tex.1986); *Dyson v. Olin Corporation,* 692 S.W.2d 456 (Tex.1985); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951).

Concerning Special Issues Nos. 1 and 6, the City contends that: (1) there is no evidence that, absent the injected gas, the economically recoverable native gas is 200,-000 mcf; and (2) the reason the economically recoverable gas under the Bennie tract, absent the injection of extraneous gas, is zero is "because when the *pressure* in the reservoir furnished by the volume of injected gas is removed from consideration, there is insufficient *pressure* to allow economic recovery." (Emphasis added) In support of this position, the City cites the following cases as controlling: *Humble Oil and Refining Company v. West,* 508 S.W.2d 812 (Tex.1974); *Exxon Corporation v. West,* 543 S.W.2d 667 (Tex.Civ.App. —Houston [1st Dist.] 1976, writ ref'd n.r. e.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 154 (1977); and *Lone Star Gas Company v. Murchison,* 353 S.W.2d 870 (Tex.Civ.App.—Dallas 1962, writ ref'd n.r. e.). These cases do not support the City's "pressure" theory.

■ The court in *Lone Star Gas Company v. Murchison,* supra at 878, embraced the language of *White v. New York State Natural Gas Corp.,* 190 F.Supp. 342 (W.D.Pa.1960), where it was stated that "[o]nce severed from the realty, however, gas and oil, like other minerals, become personal property.... [T]itle to natural gas once having been reduced to possession is not lost by the injection of such gas into a natural reservoir for storage purposes."

See also *Humble Oil and Refining Company v. West,* supra at 817. The Court in *Humble Oil and Refining Company v. West,* supra at 819, reached the following holding:

[I]t is our view that the act of commingling native and extraneous gas did not impose upon Humble [the injector of the gas] the obligation of paying royalties on all [both injected and native] gas thereafter produced from the reservoir, if the evidence establishes with reasonable certainty the volume of gas reserves upon which the Wests would have been entitled to royalties, absent injection of extraneous gas.

The *Exxon Corporation v. West* case involved the re-trial and subsequent appeal of the *Humble Oil and Refining Company v. West* case. The above cases do not require the fact finder to take the "pressure" of the injected gas into consideration when determining the amount of recoverable native gas. The jury in Special Issue No. 1 was not asked to determine the amount of economically recoverable native gas absent the pressurization caused by the injected gas.

The City argues that "absent" means absent the increased pressurization caused by the injected gas. Again, we disagree. The phrase "absent the injection of extraneous gas" as used in the context of Humble Oil and Refining Company v. West, supra, means that the Bennies, Diamond, and Morris are entitled to recover only the native gas, not native gas and extraneous gas. The phrase "absent the injection of extraneous gas" means to subtract or take away the extraneous gas from the total gas beneath the Bennie land. Even if the native gas was commingled with the injected or extraneous gas, there is sufficient evidence to support the jury's finding that, "absent" the injected gas, the volume of economically recoverable native gas was 200,000 mcf. The City's pressurization theory is not applicable.

The record supports the theory that the gas beneath the Bennie property is native gas, not injected or commingled gas. Dan Tindol, a chemist, testified that he com-

pared samples of the gas from the Bennie No. 1 with samples of the injected gas and concluded that the samples were "two different gases" from "two different sources." Stacey Smyre, an engineer, testified that the gas under the Bennie tract was different from the injected gas.

The Texas Supreme Court stated in *Elliff v. Texon Drilling Co.*, 146 Tex. 575, 210 S.W.2d 558, 561 (1948):

> In our state the landowner is regarded as having absolute title in severalty to the oil and gas in place beneath his land. The only qualification of that rule of ownership is that it must be considered in connection with the law of capture and is subject to police regulations. (Citations omitted)

See *Halbouty v. Railroad Commission*, 163 Tex. 417, 375 S.W.2d 364, 374 (1962); *Brown v. Humble Oil & Refining Co.*, 126 Tex. 296, 83 S.W.2d 935 (1935). Therefore, the Bennies, Diamond, and Morris were entitled to recover the native gas beneath their land.

■ After carefully reviewing all the evidence, we hold that there is evidence of probative force to support the jury's findings to Special Issues Nos. 1 and 6 and that those findings are not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

The City also challenges the findings to Special Issues Nos. 3 and 4.

Gary D. Askins, a former general manager of the City's gas contracts and lease records and an assistant city manager in charge of general management of the Brady Gas Company, testified as to problems with various titles to tracts of land in the Janellen Field. Askins examined the farmout agreements, the City's records, and other related documents dealing with various tracts in the Janellen field. He informed the City Council several times "that we had a serious problem with the Bennie properties"; that "several of these leases had expired and there were holes in the field"; and that in his opinion "the George O'Brien oil and gas lease had expired, due to nonpayment of rentals or nonpayments of delay royalties." Askins recommended

that the council authorize him to contact Mr. Bennie and "offer to essentially reacquire a storage lease on his land for some cash consideration" or that the council proceed with condemnation proceedings. Askins was authorized to make an initial contact with Bennie in early 1982 but nothing further was done. Askins testified that the council wanted to wait to see what developed. Askins also testified that the same problem existed with another tract of land known as the Archer tract but that the City handled that situation differently.

Askins' testimony reflects that the City was aware that the O'Brien leases had expired, that there were "holes" in the storage reservoir, and that the City had decided to "do nothing" about the situation. The jury could have inferred that the February 7, 1984, letter to Lone Star was an intentional continuation of the City's policy to "just wait them [the Bennies] out."

The Bennies, Diamond, and Morris argue that the record establishes that the "City Council determined that they would attempt to starve out Terry Bennie." However, this "starve out" testimony was presented outside the presence of the jury. We cannot consider the statements made outside the presence of the jury in determining a no evidence or a factually insufficient evidence point of error.

■ There is evidence of probative force to support the jury's finding in Special Issue No. 3 that writing the letter was an act of unjustified interference by the City. After carefully reviewing all the evidence, we hold that the jury's finding on Special Issue No. 3 is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

■ There is evidence that the writing of the letter proximately caused the damages to the Bennies, Morris, and Diamond. Plaintiffs' Exhibit No. 64, a Lone Star interoffice memo, stated:

> The February 7 letter from Mr. J.E. Gangstad, an attorney representing the City of Brady, appears to create a bona fide controversy concerning ownership of gas produced from the Terry Bennie No.

1 Well; therefore, under the provisions of Article XIII of the subject gas purchase contract it would be proper to suspense payments for production from the subject well until the controversy between the City of Brady and Diamond Mineral Investments has abated.

The record also reflects that while the Bennie No. 1 was shut-in, the gas pressure for the well decreased. The jury awarded damages in Special Issue No. 6 for the loss of gas from the time the Bennie No. 1 was shut-in until the time of trial.

There is evidence of probative force to support the jury's finding in Special Issue No. 4 that the writing of the letter was a proximate cause of the damages to the Bennies, Morris, and Diamond. After carefully reviewing all the evidence, we hold that the jury's finding on Special Issue No. 4 is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

Next, the City challenges the jury's findings to Special Issues Nos. 5 and 7.

■ Special Issue No. 5 contains an improper definition of "actual malice," but the City did not object. TEX.R.CIV.P. 274 states that "[a]ny complaint as to an instruction, issue, definition or explanatory instruction, on account of any defect, omission, or fault in pleading, shall be deemed waived unless specifically included in the objections." See *Yellow Cab and Baggage Company v. Green*, 154 Tex. 330, 277 S.W.2d 92 (1955); *Charter Builders v. Durham*, 683 S.W.2d 487 (Tex.App.—Dallas 1984, writ ref'd n.r.e.); *Jones v. City of Odessa*, 574 S.W.2d 850 (Tex.Civ.App.—El Paso 1978, writ ref'd n.r.e.). Because the City did not object, the City is bound by the definition submitted and has waived its right to complain about this definition on appeal.

■ As stated above, the evidence is sufficient to support a finding by the jury that the City sent the letter with reckless disregard of whether it was false or not. We hold that there is evidence of probative force to support the jury's findings in Special Issues Nos. 5 and 7 on actual malice and exemplary damages and that the jury's finding on Special Issue No. 5 is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

■ The City also challenges the findings to Special Issues Nos. 5 and 7 on the grounds that a municipality cannot be held liable for exemplary damages. The Supreme Court recently set out the acts which give rise to a claim for exemplary damages against a municipality in *City of Gladewater v. Pike*, 727 S.W.2d 514, 523 (Tex.1987):

In the context of exemplary damages against a municipality, however, we agree with the reasoning used by the Fifth Circuit in *Peace v. City of Center*, 372 F.2d 649 (5th Cir.1967). There, the court held that liability will result only if it is "pleaded and proved that the acts giving rise to the claim were committed with such malice or evil intent, or such gross negligence as to be equivalent to such intent." *Peace* at 650. Thus, in order to recover, the plaintiff must show at least that amount of conscious indifference which would tend to show *malice or evil intent* on the part of the actor. (Emphasis added)

A finding of actual malice will support an award of exemplary damages. Courts have defined actual malice as "ill-will, spite, evil motive, or purposing the injuring of another." *Top Value Enterprises, Inc. v. Carlson Marketing Group, Inc.*, 703 S.W.2d 806, 813 (Tex.App.—El Paso 1986, writ ref'd n.r.e.). See *Fortner v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 687 S.W.2d 8 (Tex.App.—Dallas 1984, writ ref'd n.r.e.); *State National Bank of El Paso v. Farah Manufacturing Company, Inc.*, 678 S.W.2d 661 (Tex.App.—El Paso 1984, writ dism. by agr.).

The City contends that there was no breach of contract because the gas purchase agreement contained a provision which allowed Lone Star the right not to purchase the gas if the carbon dioxide content of the gas exceeded three percent and because the record reflects that the carbon dioxide content was consistently above this

level. Arguing that a cause of action for interference with contractual relations cannot exist where a party has an option under the contract to either perform or not perform, the City cites the following cases: *C.E. Services v. Control Data Corporation,* 759 F.2d 1241 (5th Cir.1985); *Davis v. Alwac International, Inc.,* 369 S.W.2d 797 (Tex.Civ.App.—Beaumont 1963, writ ref'd n.r.e.); *Kingsbery v. Phillips Petroleum Company,* 315 S.W.2d 561 (Tex.Civ.App.—Austin 1958, writ ref'd n.r.e.); *Richardson v. Terry,* 212 S.W. 523 (Tex.Civ.App.—El Paso 1919, writ dism'd); and *Roberts v. Clark,* 103 S.W. 417 (Tex.Civ.App.—1907, no writ).

These cases deal with contracts terminable at will or with option contracts where the non-performing party had the absolute or legal right to arbitrarily refuse to carry out the contract. The gas purchase agreement was not similar to the terminable at will contracts and option contracts found in the above cases; therefore, these cases are not controlling.

■ The record does not support the City's contention that the only reason Lone Star shut in the Bennie No. 1 was because the carbon dioxide content of the gas exceeded three percent. As previously discussed, the record supports the theory that Lone Star shut in the Bennie No. 1 because of the letter.

■ Next, the City contends that the trial court erred in not granting its motion for judgment notwithstanding the verdict because the undisputed evidence demonstrates that the City owned valid leases covering the mineral estate beneath the Bennie property. The alleged error of the trial court in refusing to render judgment non obstante veredicto raises only no evidence questions for appellate review. *Rego Company v. Brannon,* 682 S.W.2d 677 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.); *Wise v. Pena,* 552 S.W.2d 196 (Tex.Civ.App.—Corpus Christi 1977, writ dism'd). In acting upon a motion for judgment notwithstanding the verdict, all testimony must be considered in a light most favorable to the party against whom the motion is sought, and every reasonable intendment deductible from the evidence is to be indulged in such party's favor. *Miranda v. Joe Myers Ford, Inc.,* 638 S.W.2d 36 (Tex.App.—Houston [1st Dist.] 1982, writ dism'd); *Regal Construction Company v. Hansel,* 596 S.W.2d 150 (Tex.Civ.App.—Houston 1979, writ ref'd n.r.e.).

■ The City argues that it conclusively established that the leases have not expired. We disagree. The leases on Bennie Tracts Nos. 1 and 2 had primary terms of five years plus a one-year extension for shut-in gas royalties. The lease on Bennie Tract No. 3 had a primary term of five years plus a five-year extension for shut-in gas royalties. No wells were drilled on the Bennie Tracts Nos. 1 and 2, and the leases expired by their own terms in 1981. The Bennie No. 1, a producing gas well, was drilled on Bennie Tract No. 3.

The City relies on *Kothmann v. Boley,* 158 Tex. 56, 308 S.W.2d 1 (1957), and other related authorities to support its contention that the litigation surrounding the farmout agreement between O'Brien (the lessee) and Brady Gas (the assignee)[4] preserved the O'Brien leases in favor of the City. This Court recently discussed the *Kothmann* case in *Cheyenne Resources, Inc. v. Criswell,* 714 S.W.2d 103, 105 (Tex.App.—Eastland 1986, no writ), stating:

It is well settled that repudiation of a lease *by a lessor* relieves the lessee from any obligation to conduct any operation on the land in order to maintain the lease in force pending a judicial resolution of the controversy between the lessee and lessor over the validity of the lease. *Kothmann v. Boley,* 158 Tex. 56, 308 S.W.2d 1 (1957); *NRG Exploration, Inc. v. Ranch,* 671 S.W.2d 649 (Tex.App.—Austin 1984, writ ref'd n.r.e.); *Tar Heel Energy Corporation v. Menking,* 621 S.W.2d 450 (Tex.Civ.App.—Corpus Christi 1981, no writ).

\* \* \* \* \* \*

**4.** *Tanbark Oil Company 1978–1, Ltd., George H. O'Brien and George O. Sanders v. City of Brady,*

*Texas,* supra.

For the doctrine [of repudiation] to apply, the court in *Adams v. Cannan*, 253 S.W.2d 948 (Tex.Civ.App.—San Antonio 1952, writ ref'd), stated that:

\* \* \* \* \* \*

The doctrine applies when the lessor takes the position and makes the same known to the lessee (or his assignees), that he, the lessor, is the owner of the property to the exclusion of all rights formerly held or claimed by the lessee. (Emphasis added)

The farmout agreement litigation involved O'Brien (the lessee) and Brady Gas (his assignee). Morris (the lessor) was not involved. Therefore, the farmout agreement litigation did not maintain the leases.

The City did not conclusively establish that because of payment of shutin gas royalty the O'Brien lease was still valid as to Bennie Tract No. 3. The record raises factual questions as to the validity of this lease. Morris testified that outside of the original lease payment he never received any additional money and that as far as he was concerned the O'Brien leases expired in June of 1981. Morris received rentals for the storage lease from 1962 until the storage lease expired in 1972. After 1972, Morris continued to receive storage lease rental payments but he returned them. Terry Bennie testified that no one had tendered any payment to him in connection with the O'Brien leases. Askins testified that he had reviewed the O'Brien leases and the payments being made and that he had concluded that the O'Brien leases had expired because of nonpayment of "rentals" or "delay royalties." Askins informed the City Council of his opinion. Furthermore, while the attorneys were discussing the proposed charge of the court, the City stipulated that the only thing that would keep the O'Brien leases "alive" would be the farmout agreement litigation. This litigation between O'Brien (the lessee) and Brady Gas (the assignee) did not constitute a "repudiation" of the lease by the lessor.

At best, the evidence raises a fact question as to the validity of the O'Brien leases. The trial court properly overruled the City's motion for judgment notwithstanding the verdict.

The City next argues that the trial court erred in admitting evidence of the City's dealings with Archer and the Archer tract because such evidence was highly prejudicial to the City as it was used to create an argument that the City had discriminated against the Bennies, Diamond, and Morris. The City objected at trial on the grounds that the witness could not "speculate on why the City treated somebody differently if, in fact, they treated them differently. Mr. Archer's a problem we've got to deal with and we're not dealing with him in this lawsuit."

The objection at trial is not the same as the objection urged in the point of error and presents nothing for review. *Texas Imports v. Allday*, 649 S.W.2d 730 (Tex.App.—Tyler 1983, writ ref'd n.r.e.); *Wilkerson v. Pic Realty Corp.*, 590 S.W.2d 780 (Tex.Civ.App.—Houston [14th Dist.] 1979, no writ). The testimony concerning the City's dealings with Archer was admissible because it was relevant to the issue of whether the City acted with malice.

The City argues that the trial court entered its judgment based upon findings not made by the jury and not requested to be submitted to the jury. The trial court's judgment states in part:

The Court finds that in Answer to Special Issue #1 that the jury found that the economic recoverable gas in the "Caddo" formation under the Bennie property at the time of the purchase of the land by them absent injection of extraneous gas was 200,000 MCF. The Court finds further that the Bennies produced and sold gas in the amount of 14,166 MCF from the time they purchased the property until the wells were shut in on the 5th day of March, 1984. The Court further finds that the Plaintiffs have been damaged according to the answer in Special Issue #6 in the amount of TWO HUNDRED AND SEVENTY FIVE THOUSAND DOLLARS ($275,000.00). The Court finds that the fair market value of gas was $3.00 per MCF and said sum therefore totals 91,-

666 MCF. The Court finds therefore, that the damages awarded are the fair market value of 91,666 MCF. The Court further finds that the Plaintiffs have produced 14,166 MCF of gas from the 31st day of July, 1981 until March 5, 1984 which includes funds suspended and held by Lone Star Gas Company, plus 91,666 MCF they have received credit for as damages leaving 94,168 MCF of native recoverable gas under their property absent injection of extraneous gas. The Court further finds that the first gas to be produced from the "Caddo" formation by the Bennie # 1 and Bennie # 3 wells after the entry of this Judgment in the amount of 94,168 MCF will be native gas absent extraneous injection gas and will be the property of the Plaintiffs. Any remaining gas following the production of that amount will be injected gas and the property of the Defendant or their assigns.

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED by the Court that Terry Bennie, Julie Bennie, Diamond Mineral Investments, Inc., and Dr. J.L. Morris do own 94,168 MCF in the "Caddo" Formation under the Terry Bennie properties which is native recoverable gas absent injection of extraneous gas which is their property and which may be produced by them. Any remaining gas following the removal of the native gas is the property of the Defendant, City of Brady, or their assigns.

During the objections to the charge, the following discussion occurred between the trial court and counsel for the parties:

ATTORNEY FOR PLAINTIFFS: Your Honor, there are a couple of matters that I think need to be made on the record, in regard to the case. The first is that I have been troubled by the fact that we do not have a percentage of gas question, as you know. My inquiry at this point in time is that when the jury answers how much mcf is in place under the proposed charge it's theoretically possible that there could be gas under the lease still that was injected gas as well. And [the attorney for the city] said that he felt that the court would in its

judgment take care of that problem by reciting that Mr. Bennie would be entitled to take the amount that the jury put in there, in that issue as his gas as the first gas withdrawn.

Now, if that is correct and we can have that stipulation, then that will solve the problem of the percent.

\*        \*        \*        \*        \*        \*

Now, if [the attorney for the City] and I can agree, the court will enter it in the judgment if there is one appropriate. I must add that whatever they put as native gas, you know, it would be less what Mr. Bennie's already produced since the date would have to be subtracted from that, but the balance would be his to recover as the first gas he recovers. That would solve the problem.

ATTORNEY FOR CITY: *I don't have any objection to that. That is what I proposed earlier. My notion in the matter is Bennie's got wells out there, they are on his property and he owns the wells. And all we need to know is how much he is entitled to produce.*

ATTORNEY FOR PLAINTIFFS: Well, that is fine. I just wanted that on the record.

THE COURT: Then it will be agreed and stipulated that the judgment will recite—

ATTORNEY FOR CITY: *He's entitled to produce X amount of gas out of those wells.*

ATTORNEY FOR PLAINTIFFS: And it will be the first gas that he produces. He doesn't have to share it or anything. Whatever the jury says is his net recoverable, economic recoverable gas, less what he's already produced, he can produce that much gas.

ATTORNEY FOR CITY: *That's right. They are his wells, he can open them up.*

THE COURT: It's so agreed then and stipulated. (Emphasis added)

▆▆ The City cannot now complain that the trial court committed reversible error when the act of which it complains actually benefitted the City. Moreover, the City

stipulated that the Bennies, Diamond, and Morris were "entitled to produce X amount of gas out of those wells." The amount of native gas that the Bennies, Diamond, and Morris were allowed to recover under the trial court's judgment is *less* than the amount the City agreed that plaintiffs could recover.

Finally, the City contends that the trial court erred in entering a judgment which did not dispose of all the parties. The City brought a cross-action against Rosanell Caraway Hickey and Union Central Life Insurance Company as cross-defendants for an accounting of the gas previously withdrawn and for a declaration of the amount of native and extraneous gases remaining for production from the cross-defendant's lands. The judgment did not expressly dispose of the cross-defendants.

The Texas Supreme Court in *North East Independent School District v. Aldridge*, 400 S.W.2d 893, 897–8 (Tex.1966), recognized that it is not always essential that the judgment expressly dispose of all parties and issues:

> When a judgment, not intrinsically interlocutory in character, is rendered and entered in a case regularly set for a conventional trial on the merits, no order for a separate trial of issues having been entered pursuant to Rule 174, Texas Rules of Civil Procedure, it will be presumed for appeal purposes that the Court intended to, and did, dispose of all parties legally before it and of all issues made by the pleadings between such parties.

So far as can be determined from the record, Hickey was never served with citation and did not answer. Therefore, the case stands as if there had been a discontinuance as to Hickey, and the judgment is to be regarded as final for the purposes of appeal. *Youngstown Sheet & Tube Co. v. Penn*, 363 S.W.2d 230 (Tex.1962). While the judgment did not expressly decree that the City take nothing as to the cross-defendants, the trial court by implication found no liability as to cross-defendants when the judgment is considered in its entirety. See *Twin City Fire Insurance Company v. Brown*, 602 S.W.2d 118 (Tex. Civ.App.—Waco 1980, no writ).

All of the points of error are overruled. The judgment of the trial court is affirmed.